UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

DAVID COTTO,

    Plaintiff,

    v.

CHRISTINA REAGLE, et al.,

    Defendants.

CAUSE NO. 3:24-CV-921-CCB-SJF

OPINION AND ORDER

David Cotto, a prisoner without a lawyer, moves for a preliminary injunction asking for additional mental health treatment and/or a transfer out of long-term segregation at Westville Correctional Facility ("Westville"). (ECF 3.) The court ordered a response to the motion by the Warden of Westville, which has now been filed.[1] (ECF 19.)

BACKGROUND

Cotto is an inmate in the long-term segregation unit at Westville, called the Westville Control Unit ("WCU"). He arrived there in May 2024. He asserts that the treatment he is receiving at Westville is not adequate to address his mental health problems and that he is at risk of suicide. (ECF 6.) He was granted leave to proceed on a claim for damages against Tori Halcarz, a mental health provider at Westville, for deliberate indifference to a serious medical need in violation of the Eighth Amendment.

---

[1] By operation of the Local Rules, any reply by Cotto was due December 27, 2024. N.D. Ind. L.R. 7-1(d)(2)(B).

(*Id*.) He is also proceeding on a claim for injunctive relief against the Warden to obtain mental health treatment required by the Eighth Amendment. (*Id.*)

The Warden has submitted more than 200 pages of medical records and other documentation in response to the motion. (ECF 19.) These records reflect that when Cotto was transferred to WCU in May 2024, a mental health provider performed an intake assessment, which included a suicide risk and mental health screening. (ECF 19-5 at 1-18.) The provider determined that he had a low risk for suicide. (*Id.*) The provider also determined that Cotto met the criteria for a Serious Mental Illness ("SMI") classification, which is used by the Indiana Department of Correction ("IDOC") to delineate inmates with chronic mental health issues. Cotto met this criteria because he has been diagnosed with Bipolar Disorder, a mood disorder. (ECF 19-5 at 12-13.)

Under IDOC policy, inmates with an SMI classification generally are not housed in restrictive housing for more than 30 days. (ECF 19-1 ¶ 12.) However, there is an exception when prison officials determine that an inmate presents a unique safety and security risk, commonly referred to as the "Danger Exception." (*Id.* ¶¶ 12-13.) If prison officials intend to keep an inmate with an SMI in long-term segregation under the Danger Exception, they must obtain approval from the IDOC's Executive Director of Behavioral Health. (*Id.* ¶ 13.) IDOC officials determined that Cotto should be housed in long-term segregation under the Danger Exception due to certain activity he engaged in while at another facility, as determined by that facility's Office of Intelligence and

Investigations.[2] (ECF 19-1 ¶ 10; ECF 19-2 ¶ 14). His placement in long-term segregation was reviewed and approved by the IDOC Executive Director of Behavioral Health. (ECF 19-2 ¶¶ 15-17.)

While in long-term segregation, Cotto has been prescribed medications to address his mental health problems. (ECF 19-8.) He also receives biweekly mental health rounds, known as "cell-front" visits, with mental health professionals. (ECF 19-6.) Records reflect that these visits have occurred every few days beginning with his arrival at WCU. (*Id.*) These records further reflect Cotto did not convey during any of these visits that that he had thoughts of suicide or self-injurious behavior. (*Id.* at 1-21.)

Because of Cotto's SMI classification, the prison conducts weekly Multidisciplinary Team ("MDT") meetings with custody staff, medical staff, and mental health professionals to discuss his status, including any mental health concerns. (ECF 19-2 ¶¶ 21-22.) Cotto also receives twice monthly mental health assessments, which are referred to as "out-of-cell" visits because they take place outside of his cell. (ECF 19-1 ¶ 15.) During these visits, a mental health professional performs an assessment and gives him an opportunity to raise any mental health concerns. Cotto had out-of-cell visits on May 18, May 30, June 13, June 27, July 11, July 25, August 8, August 22, September 5, September 16, September 30, October 14, October 28, November 8, and

---

[2] The exact reasons for officials' invocation of the Danger Exception are not revealed in the present record. They appear to relate to an alleged gang affiliation. (*See* ECF 19-9 at 2.) Public records reflect that Cotto is serving a 75-year sentence for murder imposed in 2023. *See Cotto v. State*, 228 N.E.3d 1092 (Table), 2024 WL 175915 (Ind. Ct. App. Jan. 17, 2024).

December 12.[3] (ECF 19-7.) He also had medication management visits with a

psychiatrist on June 25 and October 31. (ECF 19-8; ECF 19-9.) During one visit, the

psychiatrist reported that he told her he did not want to take his medications because he

"does not want them to 'limit' him if he decides to act out." (ECF 19-8 at 1.) Records

reflect that although Cotto discussed a variety of matters with his providers, he did not

convey during any of these visits that he had thoughts of suicide or self-injurious

behavior. (ECF 19-7; ECF 19-8.)

Cotto has submitted numerous healthcare requests since his arrival at WCU.

(ECF 19-13.) He mentioned such issues as insomnia, nightmares, headaches,

"frustration," "racing thoughts," difficulty adjusting to long-term segregation, and

feeling depressed. (*Id.*) He did not mention that he was having thoughts of suicide or

self-injurious behavior. (*Id.*) A mental health professional reviewed and responded to

each of these requests. (*Id.*)

On October 16, a routine search was performed of Cotto's cell and correctional

staff discovered 40 pills in a zip-lock bag. (ECF 19-4.) It was noted in his medical chart

that he appeared to be "med hoarding."[4] (ECF 19-11 at 11.) Although Cotto claims in his

motion and complaint that he tried to commit suicide at Westville by overdosing on

pills, there is no record of him doing so or requiring medical treatment during this

---

[3] A provider met with him for an out-of-cell visit scheduled on November 21, but he stated that he did not want to attend the session. (ECF 19-7 at 42.) She reported that he appeared "somewhat irritable" but she did not discern any other "notable" issues. (*Id.*)

[4] A nurse determined that the pills appeared to be mostly antibiotics. (ECF 19-11 at 11.) There was also a "loose brown powder" that was not identified. (*Id.*)

4

period for an apparent overdose. Two weeks after the pills were discovered and confiscated, he had an out-of-cell medication management visit with a psychiatrist. (ECF 19-9.) She evaluated him and determined that suicide precautions or crisis placement was not required at that time. (*Id*. at 3.) During this visit, Cotto stated that he was always compliant with his medication regimen and "never misse[d] . . . a dose," but the provider questioned this due to the drug levels in his blood tests during the past year, which were too low given the dosage of his medications. (*Id*. at 2.)

During this period, Cotto was seen also by medical staff to be given his medications, for blood draws, and for other medical issues. (ECF 19-11; ECF 19-12.) There is no indication he reported to nurses or other medical providers that he had tried to commit suicide or was at risk of suicide. (*Id*.) Additionally, correctional officers in WCU perform rounds of the unit every 30 minutes. (ECF 19-2 at 4.) There are no records indicating that correctional officers found Cotto unresponsive, saw him in distress, or otherwise noted anything unusual when performing their rounds during this period. (*Id*.)

As of the filing of the Warden's response, Cotto's most recent out-of-cell visit occurred on December 12. (ECF 19-10.) The provider specifically asked him if he was having suicidal thoughts. He responded, "I have my good days and my bad days." The provider noted that he was in a "euthymic mood and full affect, laughs and smiles

throughout the encounter."[5] (*Id*. at 6.) On that same date, the provider completed a formal suicide risk evaluation. (*Id.* at 1-5). The provider determined that he was at low risk of suicide as of that date. (*Id.* at 2.) If Cotto were to communicate or present any behaviors that indicated suicidal ideation, a detailed suicide prevention plan would go into effect to protect him from self-harm. (ECF 19-2 ¶ 26; ECF 19-14; ECF 19-15.)

## ANALYSIS

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original). A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

On the first prong, "the applicant need not show that [he] definitely will win the case." *Illinois Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020). However, "a mere possibility of success is not enough." *Id.* at 762. "A strong showing . . . normally includes a demonstration of how the applicant proposes to prove the key elements of its case." *Id.* at 763 (quotation marks omitted). In assessing the merits, the court does not simply "accept [the plaintiff's] allegations as true" or "give him the benefit of all

---

[5] "A patient is euthymic in bipolar disorder when [he or] she does not currently meet the threshold for depression or mania as assessed by the diagnostic criteria." *Elizabeth N. W. v. Kijakazi*, No. 3:21-CV-008, 2022 WL 278661, at *5 (N.D. Ind. Jan. 31, 2022) (citation omitted).

reasonable inferences in his favor, as would be the case in evaluating a motion to dismiss on the pleadings." *Doe v. Univ. of S. Indiana*, 43 F.4th 784, 791 (7th Cir. 2022). Instead, the court must make an assessment of the merits as "they are likely to be decided after more complete discovery and litigation." *Id.*

On the second prong, "[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with . . . injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22. Mandatory preliminary injunctions—"those requiring an affirmative act by the defendant"—are "cautiously viewed and sparingly issued." *Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020). Additionally, in the prison context, the court's ability to grant injunctive relief is limited. "[I]njunctive relief to remedy unconstitutional prison conditions must be narrowly drawn, extend no further than necessary to remedy the constitutional violation, and use the least intrusive means to correct the violation of the federal right." *Westefer v. Neal*, 682 F.3d 679, 681 (7th Cir. 2012) (citation and internal quotation marks omitted); *see also Rasho v. Jeffreys*, 22 F.4th 703, 711-13 (7th Cir. 2022) (outlining strict limitations on granting injunctive relief in  correctional setting).

Cotto's claims pertain to his medical care. Inmates are entitled to adequate medical care under the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). This includes appropriate measures to address the risk of self-harm from suicide. *Quinn v. Wexford Health Sources, Inc.*, 8 F.4th 557, 565 (7th Cir. 2021). To prove a violation of this right, a prisoner must show (1) he had an objectively serious medical need and (2) the

defendant acted with deliberate indifference to that medical need. *Id.* A medical need is "serious" if it is one that a physician has diagnosed as mandating treatment, or one that is so obvious even a lay person would recognize as needing medical attention. *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005).

On the second prong, deliberate indifference represents a high standard. "[N]egligence, gross negligence, or even recklessness as the term is used in tort cases is not enough" to prove an Eighth Amendment violation. *Hildreth v. Butler*, 960 F.3d 420, 425–26 (7th Cir. 2020). Instead, the inmate must demonstrate "a culpability standard akin to criminal recklessness." *Thomas v. Blackard*, 2 F.4th 716, 722 (7th Cir. 2021). Inmates are "not entitled to demand specific care," *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 965 (7th Cir. 2019), nor are they entitled to "the best care possible." *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). Rather, they are entitled to "reasonable measures to meet a substantial risk of serious harm." *Forbes*, 112 F.3d at 267. The court must "defer to medical professionals' treatment decisions unless there is evidence that no minimally competent professional would have so responded under those circumstances." *Walker*, 940 F.3d at 965 (citation and quotation marks omitted). In effect, the Eighth Amendment protects prisoners from "grossly inadequate medical care." *Gabb v. Wexford Health Sources, Inc.*, 945 F.3d 1027, 1033 (7th Cir. 2019).

The records before the court reflect that Cotto has serious mental health needs. They also reflect that he is under close monitoring by correctional staff, medical staff, and mental health professionals. These professionals are attuned to the risk of suicide for inmates like Cotto with a mental illness. He has received medication, in-person

psychotherapy, routine wellness checks, and medication management visits. A multi-disciplinary group also meets weekly to discuss his status, including his ongoing mental health needs. He appears to believe he should be given some other unspecified form of treatment, but his own subjective assessment of his medical needs or disagreement with his doctors does not establish an Eighth Amendment violation. *Lockett v. Bonson*, 937 F.3d 1016, 1024 (7th Cir. 2019). Based on the present record, Cotto has not demonstrated a likelihood of success in proving that medical staff are acting with deliberate indifference to his mental health needs.

To the extent he is asking the court to order his immediate release from WCU because of mental health concerns, the court must consider that "[p]rison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 547 (1979). Prisoners do not have a constitutional right to the housing assignment of their choice, and where best to house a prisoner is generally a matter that is committed to the discretion of prison officials. *See Meachum v. Fano*, 427 U.S. 215, 224 (1976); *Antonelli v. Sheahan*, 81 F.3d 1422, 1431 (7th Cir. 1996).

The court does not doubt that the conditions in long-term segregation are harsh and unpleasant. However, prison officials have determined that Cotto presents a unique danger to prison security and is most appropriately housed in long-term segregation for the time being. As outlined above, his mental health needs are being carefully monitored while he is in long-term segregation. Based on the present record,

9

he has not demonstrated an entitlement to the extraordinary remedy of a preliminary

injunction requiring his immediate release from restrictive housing. His motion will be

denied.

MOTION TO RECONSIDER SCREENING

Cotto separately moves for reconsideration of the screening order. (ECF 10.) The

court has discretionary authority to reconsider interlocutory orders any time before

final judgment. *Mintz v. Caterpillar Inc.*, 788 F.3d 673, 679 (7th Cir. 2015). This authority

"is governed by the doctrine of the law of the case, which authorizes such

reconsideration if there is a compelling reason, such as a change in, or clarification of,

law that makes clear that the earlier ruling was erroneous." *Santamarina v. Sears, Roebuck

& Co.*, 466 F.3d 570, 571–72 (7th Cir. 2006).

As outlined in the screening order, Cotto's complaint was 55 pages long with

attachments and raised sprawling allegations against 27 defendants located at both

Westville and Miami Correctional Facility ("Miami"). Among other matters, he asserted

he was improperly denied a job at Miami based on a false allegation that he was in a

gang; he was not permitted to participate in group therapy at Miami; he was subjected

to unlawful retaliation and Equal Protection violations at Miami in the form of

unwarranted cell searches; and he was at risk of suicide at Westville. The court

explained in the screening order that unrelated claims against different defendants

belong in different lawsuits. *Owens v. Evans*, 878 F.3d 559, 561 (7th Cir. 2017); *George v.

Smith*, 507 F.3d 605, 607 (7th Cir. 2007). The Seventh Circuit has urged district courts to

be alert to this issue in prisoner litigation both to "ensure manageable litigation" and to

10

prevent prisoners from avoiding the provisions of the Prison Litigation Reform Act, including the filing fee and three-strike provisions. *Henderson v. Wall*, No. 20-1455, 2021 WL 5102915, at *1 (7th Cir. Nov. 3, 2021).

When a complaint contains unrelated claims against unrelated defendants, the court's preferred practice is to strike the complaint and allow the plaintiff to file an amended complaint selecting the related claims he wishes to pursue. Here, however, Cotto raised an urgent claim about his mental health and claimed he was at risk of committing suicide. Given the exigencies of this claim, the court did not find it appropriate to delay the case by striking the complaint and requiring him to file an amended pleading. The court therefore permitted him to proceed on claims regarding his mental health treatment at Westville and dismissed his other claims without prejudice.[6] *Hecke v. Beck*, No. 24-2909, 2024 WL 5165598, at *4 (7th Cir. Dec. 19, 2024) (district court had authority to select one related claim and dismiss unrelated defendants without prejudice).

In the motion to reconsider, Cotto expresses displeasure that the court dismissed some of his claims. (ECF 10.) His unrelated claims were dismissed without prejudice, however, and he is free to pursue them in separate lawsuits if he wishes. (*See* ECF 6.) He states that the "lion" of his complaint was a claim that his Due Process rights were violated when officials at Miami made the decision to transfer him to long-term segregation. (ECF 10 at 1.) However, his complaint named employees of both Miami

---

[6] The court also screened and dismissed claims against certain defendants that related to his mental health but did not state a claim for relief. (ECF 6 at 5-7.)

and Westville as defendants and outlined a host of alleged constitutional violations occurring at both facilities. It was not at all clear from this pleading that he only wanted to proceed on a Due Process claim against officials at Miami related to his transfer.

Additionally, this case is already proceeding on his mental health claims, and there is no indication from his filings that he wishes to abandon these claims.[7] (*See* ECF 10; ECF 17-1.) The court continues to be of the view that his disparate claims cannot manageably or appropriately be litigated in one lawsuit. The court declines to alter the screening order, but reminds Cotto that he is free to challenge the decision of officials at Miami to transfer him in a new case, subject to the usual constraints of the Prison Litigation Reform Act.

For these reasons, the court:

(1) DENIES the plaintiff's motion for a preliminary injunction (ECF 3); and

(2) DENIES the plaintiff's motion to reconsider the screening order (ECF 10).

SO ORDERED on January 6, 2025.

s/ Cristal C. Brisco
JUDGE
UNITED STATES DISTRICT COURT

---

[7] He recently filed a motion to amend his complaint, which is pending before the Magistrate Judge. (ECF 17.) He submitted a proposed amended complaint with the motion and it contains claims related to his current mental health problems at Westville as well as other issues. (ECF 17-1.)